I note that this is your morning in the court. You have two additional arguments. Seems to be my morning. May it please the court. Donovan Cross was convicted in the Northern District of Iowa before District Judge Mark Bennett of being a prohibited person in possession of a firearm and ammunition. His case is factually quite memorable. It involved or surrounded the discovery of a firearm and some ammunition that fell out of a laundry basket in a home in Sioux City, Iowa. His appeal raises various issues at the stages of his case at the district court level. First, with respect to the denial of his motion to express evidence, specifically the firearm and ammunition. Second, with respect to his conviction at a jury trial. And then third, with respect to his sentence of 120 months imprisonment at the statutory maximum. Subject to any questions that the court has, I intend to proceed somewhat chronologically, starting with the denial of the motion to suppress, moving to trial related issues, and then to the extent there's time to the sentencing related issues. Mr. Cross moved to suppress the evidence used against him before trial on the basis that there was not valid consent for an entry into a home that he shared with his grandmother in Sioux City, Iowa. The district court denied that motion to suppress on two bases. First, the district judge found that Donovan Cross's grandmother, a woman named Andrea Cross, gave officers consent for the entry into the home that directly led to the discovery of the firearm and ammunition. And then second, the district court found that Mr. Cross's girlfriend, a woman named Sophia Finagua, provided consent for the entry into the home. Starting first with the district court's conclusion that the grandmother, Andrea Cross, provided consent for the entry. I'll give a little bit of background necessary to resolve that issue. This case started with a 911 call from Andrea Cross to the Sioux City Police on June 4th of 2016. Andrea Cross reported that Donovan, the appellant, and his girlfriend, Sophia, were in an argument and it sounded physical. Andrea reported that she did not know the last name of Sophia, the girlfriend. She said that she was going to leave the home and that in order to resolve the dispute between Mr. Cross and Sophia, officers could enter through the front door. Andrea left the home. Sioux City Police arrived at the scene. Initially, they remained outside of the home. This is a home that was rented by Andrea Cross. She was the only one who was on the lease for the home. She's the one who paid the ordinary expenses for the home as well. They called for Mr. Cross and Sophia to leave the home. Sophia initially left the home. She went right back in when she saw police and then she eventually came out. At that point, she was safe. Police called for Mr. Cross to come out of the home. He eventually did. He happened to be, for the most part, naked when he came out of the home and he was placed under arrest. I don't want to repeat the facts, but I thought, how can, okay, he went, he took the police in with him to get dressed. He did. And then he got dressed. They saw where he got dressed. They saw parts of the, I guess, second floor at that point. And then she has, says, maybe even invites the police to go with her to get her belongings. Because she wanted to move out, right? And by she, you mean Sophia? Yeah. So what happened was- Grandma's not in the picture at that point. Correct, Grandma's not at the scene. And the only entry, or everything that the police officer accompanying her to get her belongings did, was consistent with that limited consent, right? The consent from Sophia? Yes. Yes, if you're assuming that Sophia had the standing to grant that consent, correct. She doesn't have, she says, I want to go in and get my belongings. So it was a little different than that. The police actually invited her to go inside the home to get her belongings. But yes, she took police up on that invitation. Are you saying she can't do that? I am saying she can't do that. This, in my view, is a unique case as compared to the cases cited in both. Forget whether she had any authority, actual or apparent, to invite them in for a broader search. What case would say that someone who says, I'm living there, and I want to move out, and I want to go get my stuff, but I have- Sure. So- Have you got any case that's even close to saying that that limited consent is, for some reason, unconstitutional? As you can imagine, there's a million different fact patterns. I don't have one precisely on point for the point that you're raising. What I'm asking- You argue about grandma's consent, you know, grandma, and so forth and so on. I think all the district court said was, she had both actual and apparent authority to give that limited consent, please come with me, or shall we come with you, to get your belongings. She'd just been beat up and wanted to move out, and grandma wanted her to move out, as it turned out. I'm not sure they knew that at the time. Right. I just think this doesn't- I understand the argument, and the third party consent issues are often difficult, but this one doesn't seem to me to be very complex or difficult. I'm not unaccustomed to being disagreed with, but the way I read Illinois versus Rodriguez, which is kind of the cardinal case on the issue of whether a third party has apparent authority to authorize police to enter a home, is that it must be reasonable from the perspective of the officer to believe that the third party has reasonable expectation of privacy. It must be reasonable for police to believe that that person has some authority over the property that they're going to be entering into. And I think you have to look at Minnesota versus Olson, the Supreme Court's opinion from 1990 on this score. This is the case that deals with whether an overnight guest, a social guest, has a reasonable expectation of privacy in a home such that he or she can have standing to complain of a search there. The Supreme Court in Olson talks about the social custom that we have in inviting people into our homes and welcoming them. How about the community caretaking aspect of the Fourth Amendment jurisprudence? It seems to me at a minimum, this is a reasonable exercise of the police officer's community caretaking obligations. In my view, the dispute between Sophia and Mr. Cross was the primary reason, obviously, that police were present in the area of Mr. Cross' home. Once Sophia had exited the home, and she was safe, and she wasn't going back into the home. She was not under arrest, but she was with a police officer at that time. And once Mr. Cross was under arrest, the community caretaking aspect of this is over. Is it understandable that Sophia may want to go back into the home and get her belongings? Yes, but that doesn't necessarily mean that law enforcement has to be a party to that entry into the home, whether it's limited or more broad. And with Minnesota versus Olson, I do think that there's a distinction between a regular overnight guest, a social guest in a home, and someone like Sophia. There was testimony elicited at both the motion to suppress hearing before the magistrate judge and at trial that would suggest that Andrea Cross, the individual who rented the home, did not want Sophia around. She wasn't, I wouldn't call her a trespasser by any means, but she was something close to that. We had testimony, if you look at page 58 of the suppression hearing transcript, where Andrea Cross said she had told Sophia to leave the home before. She told other people to leave the home before, but she had basically been ignored. So in my view, when we're looking at what society would deem to be reasonable in the context of this case, it's not my view that society would find this type of entry reasonable. Was there anything in the suppression record about whether Sophia told the police officer at the time that Grandma wanted her out of there? No, there was nothing along those lines. But that turned out to be the case. It turned out to be the case. You look at Illinois versus Rodriguez, there is a passage there, 497 US at 188, where the court says, and this is the case again dealing with a parent authority, there may be circumstances in which an individual gives an explicit assertion that he or she resides on a particular piece of property, that they've been there, they've been staying there. But there are circumstances in which law enforcement should ask more questions to determine that person's connection to the home. In my view, this is such a case when you look at the 911 call from Andrea Cross, the grandmother. This is an individual who the prosecution has relied upon the fact that she stayed in the home for a few days in the past. But it's very odd that in the 911 call, Andrea Cross says, well, I don't even know her last name. In my view, that's something that should have spawned additional inquiry into Sophia's connection to the home and whether she had the requisite authority to authorize the entry into the home with law enforcement. The extent of the inquiry that I can see in the record is in Defendant's Exhibit C1 from the motion to suppress hearing. This is the video from the squad car with the brief interaction between Officer Paul Yanoff, Sioux City Police Department, and Mr. Cross, where Officer Yanoff asked Mr. Cross if Sophia lives in the home, Mr. Cross says something like no, but, and then there's some further questioning by Officer Yanoff. And ultimately, the answer is ambiguous. And that's the extent of the inquiry that was done into Sophia's connection. The argument is the officer should have continued in his questioning? Yes, that is my position. Early on you said this is a unique case and I wrote down why, but I guess you've been answering my question since. Is it unique factually or legally or both? Both with respect to the motion to suppress. It's unique factually because we're dealing with a firearm that fell out of a laundry basket. Unusual and memorable. It's unique legally in that none of the cases, as I said, that the party cited in the briefing, in my view, deal with the issue where there's reliable evidence to believe that the party who granted consent was an unwelcome party at the home. Like I said, not a trespasser, but certainly not the social guest that was described in Minnesota versus Olson. Well, I guess as I tell my law clerks, well, don't everybody know this? Cases, search and seizure cases are like snowflakes. They're never two that are exactly the same. That's an excellent point. To what extent do we, well, anyway. Excellent point. So we view the district court as having committed error by- It's like a blizzard. Pardon? It's like a blizzard frequently. A blizzard, right, right, right. Another fair point. You'll probably, excuse me, I don't want to interrupt the train of your thought, but what about the fact that Judge Bennett also had the alternative ruling? Does that have any impact on your argument at all? It does because, as I said, the district court relied on those two rulings for denying the motion to suppress. In my view, District Judge Bennett committed clear error by making the factual finding that Andrea Cross's consent, to the extent there was any, was not limited to resolving the dispute between Sophia and Mr. Cross. This was not, we had an evidentiary hearing before the magistrate judge, Magistrate Judge C.J. Williams. He didn't include anything in his report and recommendation making a finding that Andrea Cross had provided open-ended consent for entry into her home. This was something that District Judge Bennett decided on. In my view, you can't look at the evidence regarding the 911 call in the record and come to the conclusion that Andrea Cross's permission for law enforcement to enter was open-ended. It's a matter of drawing a line somewhere. In my view, it's clear that she meant to resolve the ongoing physical disturbance between Sophia and Mr. Cross, law enforcement could enter the front door. It takes another step to come to the conclusion, as District Judge Bennett did, that it also included, after everyone was safe, after Mr. Cross had been arrested, that there was consent again for law enforcement to enter the home. But isn't it sort of surrealistic to expect the officers to make those fine gradations in the information they have? In other words, at what point do they have to determine the landlord's right versus the tenant's right and all that sort of thing? Or the third party's right? And your argument is they have to do more than they did, but our question is, when we write the opinion, how much was enough? How much was enough? There could have been, I don't know how much is enough, I guess, is the easy answer, but there should have been more. There have been more. If you look at Exhibit C1, there's just not enough in this record. I see I'm running low on time. With the panel's permission, I'll reserve the reigner of my time for rebuttal. Yes, and thank you for watching the clock. I don't want to be critical of the first attorney, but you're an experienced attorney and I don't suppose you've ever been caught short. We'll hear from the government. Mr. Alexander, good morning. You may proceed when you're ready. May it please the court. Also. My name is OJ Alexander. I'm a special assistant United States attorney with the Northern District of Iowa, representing the United States government in this case. There were seven issues that were briefed by the parties. The first of which I'll address is the motion suppressed, since that was the one that Mr. Hansen left off on. As Mr. Hansen had noted, the district court made findings that there was consent, and then there was apparent authority of the defendant's girlfriend. The facts of the case show, Your Honors, that the 911 call was specifically to address or to resolve the disturbance. The question then becomes, what was the disturbance? Because we have to first understand what the disturbance was. This wasn't a simple quarrel where you can separate two individuals, put handcuffs- You better speak a little more slowly. I apologize, Your Honor. I was going to say the same thing, and I suppose it's no criticism of you that others have said that to you over the years in the courtroom. Maybe- It's actually possible. So, gear it down for the older persons like me. I'm the old person here, so. Not a problem, Your Honor. The 911 call was about resolving a disturbance. And when it comes to this case, the question then becomes, what was the disturbance? This wasn't a simple argument between two people where you separate them, they cool down, everything's fine. Resolving disturbance relies on what the actual disturbance was. Here, it was a physical domestic assault. And as Officer Paul Yanev of the Sioux City Police Department testified on page 35 of the suppression hearing, when it comes to domestic assaults, officers do three things. First, is to ensure the safety of the victim. Second, to reassure the victim that she has options. And third, to help the victim get to the next step. In this particular case, it wasn't just about putting handcuffs on the defendant and the disturbance is resolved. Now we have to determine what's going to happen to Sophia. Because the information that Officer Yanev received from Sophia in his discussion with her, is that within a five day period, there were two separate domestic assaults. The first of which occurring on May 31st, 2016. That one resulted in a very visible eye injury. And in the government's exhibit that was presented at the suppression hearing, it's a very visible injury. Her eye was extremely bruised. The white of her eye was bloodshot red. She was shaking, she was crying. She was still very much traumatized from what happened that day. But that assault occurred on May 31st, five days later, we now have a second one. So officers know, we can't just pack up and leave. Part of our responsibility is to ensure her safety. So they made arrangements with Sophia to, well they asked Sophia, where can you go? Because you can't live here anymore. And at no point did she say, I don't live here, I actually live a few blocks away. She never identified another residence. Instead she says, I'll go live with my mom, who lives in Kingsley, Iowa, 30 minutes away. There was no vehicle at the house that she could have just driven back and forth on her own. And earlier in the day, the officers observed Sophia for the first time at this residence. They had no prior knowledge of her. They had no knowledge that she belongs at a different residence in Sioux City, or that she's from a different part of town, or a different part of the state. This was her first exposure. She's running outside the house after screaming. Then she sees the officers and runs back in. She doesn't fight her way in, she doesn't knock, she doesn't sneak through a window. She goes right through the front door. Officers establish a perimeter, she remains in the house during the course of the perimeter. And then she exits of her own volition. She then tells officers that she wants to go live with her mom, and the officers ask her. So although Mr. Hanson says that the officers essentially invited themselves into the house, that's not true. They asked Sophia, do you want to get your belongings now, or do you want to come back later with a standby officer? And she said, I want to get my belongings now. And Officer Yanev then says, do you mind if we come with you? And she says, absolutely. So two officers escort her into the house. And when we look at the officer's behaviors, Your Honor, we see two officers that escorted Sophia Finago, a victim of domestic assault, into the home. They did not search that home. They did not ask her, do you mind if we search the home? They simply asked her to escort her to her bedroom to gather her belongings. And while doing so, on the way, she said, this is where I sleep. She goes in the bedroom, but Officer Yanev stays at the doorway. He doesn't go in. He doesn't tell Sophia, do you mind looking in the laundry basket? Doesn't direct her to search on his behalf. So with that being the case, that's when, as she was gathering her belongings, she pulls a t-shirt and the gun falls out of the laundry hamper. Now, as Mr. Hanson had noted, this was a defendant who approached the officers, who had stripped naked, with a hand towel covering his genitals after approximately between six to eight minutes of a perimeter, officers commanding him to come outside. He eventually comes outside, stripped naked, saying, I wasn't in the shower the whole time, but he was completely dry. And that's critical because later on, after the officers find the search warrant, they secure the residence, obtain a search warrant, and then seize the incriminating evidence. Officer Yanev then approaches the defendant afterwards and tells him about the gun. And immediately the defendant says, that's my grandmother's gun. And the reason that's important is because it shows knowledge of the gun. He doesn't say, I had no idea there was a gun in my house. He says, that's my grandmother's gun. And Officer Yanev says, well, you're going to be charged as a felon in possession. And then the defendant responds, well, I'm not in possession because it's not physically on me. And of course, it's not physically on him because he was naked with a hand towel. Then the officer told him, well, if you're in possession, it means it can't be in your bedroom. And immediately the defendant says, that's not my bedroom. My bedroom is the one across the hall. And that room, Your Honor, as Officer Yanev testified, had a couch, a table, and a bedroom. And there were only two other bedrooms in that house. One belonged to the grandmother, one belonged to the defendant, and it was in the defendant's bedroom in which it was found. So the district court judge was correct that the officers acted within the scope of the consent, because it wasn't about searching. The only time they actually searched that house was once they obtained the search warrant. Beyond that, it was strictly to ensure the safety of the victim. And the officers did reasonably believe, based on the facts that I've just listed, as to the apparent authority of Sofia Finagua. That was a point that both the district court and the magistrate agreed. The district court did not address actual authority, but as the magistrate court recognized, there was also actual authority. And if the court does not have any further questions on this particular issue, I'll move on to the next issue at hand. This was the admission of the jail call at trial. And the district court found that this was more probative than prejudicial. Its admission is a no-brainer. Primarily because this phone call was a phone call in which the defendant was trying to convince Sofia to take the blame for the gun, and he was trying to guilt her. The district court recognized and said this was the defendant's attempt to cajole Sofia into taking the blame for that gun. And the defense's assertion is that this violates rule 403. Primarily because that the recording has a quote, innocent explanation. The government's perspective on that argument is that the defense concedes that this conversation was about the gun. There's no question this conversation was about the gun. But even if a piece of evidence has more than one interpretation, that does not make it prejudicial or unfairly prejudicial. Well, was there, the prejudice alleged, at least in the brief, was it told the jury he was detained? It did not, your honor. The actual phone call makes no reference to the defendant being in detention. The source of the phone call and the way it was recorded was never disclosed? It was never presented at trial, correct. The call was simply played and it was just made known that the call was between the defendant and Sofia and occurred I think approximately July 20th, 21st, 2016. That was a limited aspect of it. At no point during the government's case in chief, at no point in the government's opening statement or even in its closing statement was there any reference to the defendant being arrested, in handcuffs, or in jail. This phone call was simply that point. It was just a conversation between two individuals and the defense's objection is that you can insinuate because the call was recorded that the defendant was in jail, but that's not true. And the district court recognized that's a very bold assertion. The defense then objects on four or three grounds because of the crude language and that the defendant spoke in a frantic tone. The crude language in reference to this phone call was simply one, the use of the F word once. That itself does not rise to unfair prejudice that would, in which this appropriate value would be substantially outweighed by it. And speaking in a frantic tone doesn't qualify either. And upon my reading, I want to just correct something that I've noticed in the defense's brief, and they essentially argue that these are two separate phone calls. They're not. This is one phone call played back to back at the hearing. The reason it was presented at trial as 5A and 5B was because it was a longer conversation and these were experts of that conversation. The defense never objected that this was two separate calls. It was a call of sentencing. Correct. It was just one phone call, Your Honor. It was just presented as 5A and 5B, just because it spliced the conversation. So that, Your Honor, I would argue that there was no abuse of discretion regarding the admission of this phone call. In regards to the trial itself, the sufficiency of the evidence, the government would argue that the evidence was sufficient to show that the defendant was prohibited by law from possessing a gun, that he did possess that gun, and that the gun had traveled interstate commerce. Now, as the court is aware from the government's briefing, any evidence regarding the domestic assault was excluded from the trial. So the government was restricted in the type of evidence it can use, most of which was circumstantial. Any evidence that the disturbance occurred in the bedroom was excluded. Any evidence that something happened in the bedroom that prompted Sophia to run out screaming was excluded. Any reference that the defendant was in the house for herself naked was excluded. The government had to rely on evidence of what was found in the bedroom. That the bedroom had men's clothing, mail, and documents with the defendant's name on it. That the defendant's own grandmother testified that that's the defendant's room. That there were times when she would try to go in and he would kick her out. That he had control of that room. The holster that fits the gun was found in the bathroom next to the defendant's debit card and mail with his name on it. And in the room that he identified as his own bedroom, the studio had a single round of ammunition consistent with the ammunition found in the gun. And of course, the conversation with Officer Paul Yanev and the defendant regarding the gun being his grandmother's and jumping back and forth. The jail phone call in which the defendant attempts to convince his girlfriend to take the blame for the gun. That was admitted, as well as the DNA experts. It was a battle of the experts. We had a DNA expert who testified that this defendant's DNA matched all 15 DNA markers. That this shows that this defendant was a major profile contributor. And that it is more likely that if you're matching on all 15, you had direct contact with this gun. And the defense's expert testifies that there's just no absolutes. You don't know if it's direct, you don't know if it's secondary transference. But when I asked him at cross-examination whether it was possible that this could have been direct contact, his one word answer was absolutely. Based upon the evidence that was presented at trial, it was more than sufficient to show that the defendant was prohibited by law and in possession of that firearm. Because the government also presented evidence that the gun had traveled interstate in commerce, so was the ammunition. And that the defendant was prohibited by law because of his felon status, as well as he was a non-lawful user of controlled substances. In regards to the issues at sentencing. The first of which focuses on the admission of the two jail calls and the grand jury transcript at the sentencing. Now, as this court has recognized in the United States v. Gantt, the district court has wide latitude in considering evidence under the 3553A analysis. And the district court can conduct an inquiry broad in scope and can consider information that is largely unlimited. In this case, there are two jail calls. One of which was the one that was presented at the suppression hearing, in which the defendant essentially was verbally abusive to his grandmother. And told her that the only way we're going to beat this is if you testify exactly the way I want you to. And trying to control that type of testimony. Magistrate Judge C.J. Williams, in his opinion, stated that this was a pretty blatant attempt by the defendant to manipulate the testimony of his own grandmother. That was presented for the court's consideration. And there was also the phone call that took place after the trial. In which the defendant was having an argument with Sophia, blaming her, saying it's your fault I'm in here. And after a back and forth, Sophia yells, and I won't use the exact language. But she essentially says, you're the one waving that gun around. But when it comes to taking responsibility, you're the one who refuses to do so. And that's essentially what she was trying to say. So I brought that to the court's attention. And the defense argues that it's not relevant and that it's too prejudicial. But the rules of evidence don't apply in sentencing and the district court has a right to consider that evidence. We then look at the grand jury transcript and the defense says that it's unreliable. It argues that the two instances of domestic violence mentioned in the grand jury transcript were, one was dismissed, one was uncharged. But as this court has recognized the United States v. Thomas, a district court can consider uncharged, charged, dismissed, and acquitted conduct as relevant conduct for 3553A analysis. And then the defense argues on the confrontation clause. But the confrontation clause does not apply in sentencing and it doesn't go to the reliability of a grand jury transcript, which is a transcript of an individual placed under oath subject to penalty of perjury. So its admission was appropriate. We then look at the guidelines, and this is a bit of an unusual case, your honors, because the defendant had a terroristic threats conviction arising out of Nebraska. And he also had a controlled substance conviction out of the state of Iowa, both of which were under consideration by this court at the time and had not been resolved. So the district court found that one qualified as a controlled substance violation, the other did not. But then this court ruled in Fletcher v. United States that the defendant's prior conviction for terroristic threats in Nebraska does qualify as a crime of violence. Therefore, his base offense level should have been 24, two level enhancement for obstruction. At category five, his guideline would have been 110 to 120. So then the question becomes, was it substantively reasonable for a sentence to be at the statutory maximum 120? And the district court found that this defendant has a history of assaulting women. That he was a habitual domestic abuser because of at least five instances. Relying on the two instances regarding Sofia Finagua, the fact that the defendant assaulted his own mother, and the two instances mentioned in the grand jury transcript. So based on that, your honor, it is substantively reasonable. This was not the type of sentence that should be reversed. And I can see that my time is running out. If the court does not have any questions, I would ask the court to deny the defendant's appeal on all the grounds. All right, well, we thank you for your argument. Thank you. Well, opposing counsel has opened up a lot for rebuttal by arguing issues that you didn't address, so. Yes, he did, and in my limited time, I'm going to focus on the admission of the jail call at trial. This was exhibit 5A and exhibit 5B referenced by Mr. Alexander. The problem with the government's argument as to the probative value of this jail call is that the probative value is ambiguous. There were two reasonable explanations for what was going on in that phone call. It was reasonable to conclude, as Mr. Cross would argue, that the phone call was about him encouraging Sophia to provide information as to whose gun that actually was. Also reasonable, I agree, that the call could be interpreted as an attempt to convince Sophia to take the rap for the gun. The problem by admitting that particular piece of evidence is it required the jury to speculate as to what exactly was going on in the phone call. If there was a more innocent explanation, then of course, Mr. Cross was prejudiced for that very reason. I would take issue with the argument that it wasn't obvious that the call was a jail call. You can hear jail noises in the background. How many other circumstances are there in which calls are recorded? And Mr. Cross makes a reference to the possibility that he could serve the rest of his life in prison. Clearly, any reasonable juror would conclude that was a jail call, and it forced Mr. Cross to be in a position where the jury knew that he was detained pending trial. The admission of this particular jail call was not harmless. Did know. The jury did know. Any reasonable jury would know from the nature of that call, from what was said in that call, from the jail noises in the background. There was no express reference to it being a jail call. That's correct. I see my time is up. I'd simply ask the court to reverse the district court. Very well, thank you for the argument and the briefs. And the case is now submitted, and we'll take it under consideration.